UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| USI INSURANCE SERVICES, LLC, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) Case No. 1:14-cv-151 |
| JOHN E. RYAN and WDCK, LLC, d/b/a The DeHayes Group, | ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiff USI Insurance Services, LLC ("USI"), filed this action against Defendants John Ryan and WDCK, LLC, d/b/a The DeHayes Group ("DeHayes"), seeking injunctive relief and damages due to Ryan's alleged breach of an Employment Agreement, trade secret violations, and tortious interference with contract and business relationships. (Docket # 1.) USI contends that it was assigned the Employment Agreement when it purchased a portion of the assets of Wells Fargo Insurance Services USA, Inc. ("Wells Fargo"), Ryan's former employer.

Now before the Court is a fully-briefed motion to disqualify Ryan's counsel, Barrett & McNagny, LLP ("B&M"), based upon a purported conflict of interest given that B&M wrote the Employment Agreement in question and formerly represented Wells Fargo and its predecessors. (Docket # 25, 26, 37, 49.) For the following reasons, USI's motion to disqualify will be GRANTED.

### *A. Factual and Procedural Background*

USI is engaged in the insurance business in Fort Wayne, Indiana. (Niezer Decl. ¶ 3.) It acquired its Fort Wayne-based insurance operations, including all of its assets, information, and

goodwill (the "Fort Wayne Business"), from Wells Fargo in May 2014 in an asset purchase transaction.[1] (Niezer Decl. ¶ 7.)

Before it was owned by Wells Fargo, the Fort Wayne Business was owned by Acordia, Inc., and prior to that, O'Rourke, Andrews, & Maroney ("OAM"). (Niezer Decl. ¶ 9.) William Niezer, who was President of OAM, has been in charge of the Fort Wayne Business at all relevant times, regardless of whether it was owned by OAM, Acordia, Wells Fargo, or USI. (Niezer Decl. ¶ 12.)

USI states that it now conducts the same type of insurance business in Fort Wayne that Wells Fargo did before the May 2014 transaction. (Niezer Decl. ¶ 7.) It has the same leader–Niezer; the same physical location; the same clients; and employs the same brokers, except for Defendant Ryan. (Niezer Decl. ¶¶ 7, 8, 16.) Niezer hired Ryan in 1994 when OAM owned the Fort Wayne Business, and Ryan continued his employment with the Fort Wayne Business during the Acordia and Wells Fargo ownerships. (Niezer Decl. ¶¶ 13, 15.) Ryan, however, refused USI's offer of employment, and in May 2014 went to work for its direct competitor, Defendant DeHayes. (Niezer Decl. ¶¶ 5-6.) USI alleges in this action that Ryan's work for DeHayes is in breach of the non-solicitation and non-disclosure covenants of the Employment Agreement that he entered into with OAM in 1994, which purportedly was assigned to Acordia, Wells Fargo, and then USI. (Niezer Decl. ¶ 13, Ex. A.)

B&M, a Fort Wayne-based law firm, represented the Fort Wayne Business since its inception in the 1920s and continued for almost a century, until some point in 2013. (Niezer Decl.

---

[1] USI acquired forty-one other Wells Fargo insurance locations around the country in that same transaction. (Reply Ex. 3.)

¶ 11.) Thus, B&M has represented OAM, Acordia, and Wells Fargo. (Niezer Decl. ¶ 11.) The representation included a variety of legal matters, including employment-related issues. (Niezer Decl. ¶ 11.)

As part of this representation, B&M wrote–at Niezer's direction and in consultation with him as the company representative–the Employment Agreement at issue here that Ryan signed in 1994. (Niezer Decl. ¶ 14.) Also, in 2009, B&M represented Wells Fargo in a case against DeHayes and another departing employee, who, like Ryan, was alleged to have breached an employment contract, misappropriated trade secrets, and engaged in tortious interference with business and contractual relations. (Niezer Decl. ¶ 19 (citing *Wells Fargo Ins. Servs. v. DeHayes Grp. & Relue*, No. 02C01-0704-PL-47 (Allen Cir. Ct. 2009)); Kimbrough Aff. ¶ 3, Ex. 1.)

### B. Legal Framework

Indiana Rule of Professional Conduct 1.9(a) has been adopted by the Northern District of Indiana in its Local Rules as the standard of professional conduct. *See* N.D. Ind. L. R. 83-5(e). Rule 1.9(a) provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

In determining whether an attorney should be disqualified, the Seventh Circuit Court of Appeals looks to "whether a substantial relationship exists between the subject matter of the prior and present representations." *In re Neely*, No. 2:11-CV-140, 2012 WL 1714415, at *4 (N.D. Ind. May 14, 2012) (quoting *Cromley v. Bd. of Educ. of Lockport Twp. High Sch. Dist. 205*, 17 F.3d 1059, 1064 (7th Cir. 1994)); *see also Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir. 1983); *LaSalle Nat'l Bank v. Lake Cnty.*, 703 F.2d 252, 255-56 (7th Cir. 1983). To determine whether a

substantial relationship exists, the Court engages in a three step inquiry:

> First, the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Third, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.

*Jones & Henry, Eng'rs, Ltd. v. Town of Orland, Ind.*, 942 F. Supp. 1202, 1206 (N.D. Ind. 1996) (quoting *LaSalle Nat'l Bank*, 703 F.2d at 255-56).

If the Court finds a substantial relationship exists, the non-movant has the opportunity, in certain circumstances, to rebut the presumption it received confidential information during the prior representation. *Ramos v. Pabey*, No. 2:05CV189, 2005 WL 2240036, at *4 (N.D. Ind. Sept. 13, 2005); *Cromley*, 205 F.3d at 1064. The presumption is rebuttable when "a member or associate of a law firm changes jobs and later, he or his new firm is retained by an adversary of a client of his former firm" and the lawyer shows "that effective measures were taken to prevent confidences from being received by whichever lawyers in the new firm are handling the new matter." *Leathermon v. Grandview Mem. Gardens, Inc.*, No. 4:07-cv-137, 2010 WL 1381893, at *9 (S.D. Ind. Mar. 31, 2010).

But the presumption that confidential information was received during the prior representation is irrebuttable and an attorney cannot avoid disqualification where the court finds a substantial relationship exists and the "individual attorney himself switches sides and represents a new client against a former client." *Leathermon*, 2010 WL 1381893, at *9 (citing *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1266-67 (7th Cir. 1983)).

"The Seventh Circuit warns that disqualification 'is a drastic measure which courts should hesitate to impose except when absolutely necessary.'" *Exterior Sys., Inc. v. Noble Composites,*

4

*Inc.*, 210 F. Supp. 2d 1062, 1067 (N.D. Ind. 2002) (quoting *Cromley*, 17 F.3d at 1066). Yet, at the same time, it instructs that "any doubts as to the existence of an asserted conflict must be resolved in favor of disqualification." *United States v. Goot*, 894 F.2d 231, 235 (7th Cir. 1990). "[C]ourts have a duty to safeguard the sacrosanct privacy of the attorney-client relationship so as to maintain public confidence in the legal profession and to protect the integrity of the judicial proceeding." *Chem. Waste Mgmt. v. Sims*, 875 F. Supp. 501, 503 (N.D. Ill. 1994).

### C. Discussion

USI asserts that B&M should be disqualified under Rule 1.9(a) from representing Ryan in this matter because: (1) B&M wrote Ryan's Employment Agreement for USI's predecessor, OAM, and (2) represented another predecessor, Wells Fargo, in a similar dispute against DeHayes and another departing employee. In response, B&M argues that control of Wells Fargo–and thus, the attorney-client privilege–did not pass to USI in the asset sale; therefore, USI is not a former client, and Rule 1.9 does not apply. And even if control did pass, B&M urges that its long-ago drafting of the Employment Agreement for OAM and its more recent representation of Wells Fargo in the *Relue* case are not substantially related to the instant matter.

1. <u>The authority to assert the attorney-client privilege passed to USI in the asset sale</u>.

"[T]he right to assert or waive a corporation's attorney-client privilege is an incident of control of the corporation." *Am. Int'l Specialty Lines Ins. Co. v. NWI-I, Inc.*, 240 F.R.D. 401, 407 (N.D. Ill. 2007); *see John Crane Prod. Solutions, Inc.*, No. 3:11-cv-3237-D, 2012 WL 1694084, at *1 (N.D. Tex. May 15, 2012) ("'New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession' control the attorney-client privilege previously controlled by old management." (quoting *Commodity Futures Trading Comm'n v.*

5

*Weintraub,* 471 U.S. 343, 349 (1985))). "[A] transfer of assets, without more, is not sufficient to effect a transfer of the privileges; control of the entity possessing the privileges must also pass for the privileges to pass." *Am. Int'l Specialty,* 240 F.R.D. at 407 (quotation omitted) (collecting cases).

Some courts, however, have concluded that this "bright-line rule cannot capture 'the myriad ways control of a corporation or a portion of a corporation can change hands . . . .'" *John Crane Prod.*, 2012 WL 1694084, at *1 (quoting *Soverain Software LLC v. Gap*, 340 F. Supp. 2d 760, 763 (E.D. Tex. 2004)). "[S]o when determining whether the attorney-client privilege transfers[,] courts should examine whether 'the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management,' and if they do, 'the attorney-client privilege will follow as well.'" *John Crane Prod.*, 2012 WL 1694084, at *1 (quoting *Soverain Software*, 340 F. Supp. 2d at 763); *accord UTStarcom, Inc. v. Starent Networks,* Corp., No. 07 C 2582, 2009 WL 4908579, at*3 (N.D. Ill. Feb. 20, 2009); *Parus Holdings, Inc. v. Banner & Witcoff, Ltd.*, 585 F. Supp. 2d 995, 1002 (N.D. Ill. 2008) (articulating that the rule from *Soverain* is "the better reasoned rule, and the one that appears to be followed by the majority of recent cases"); *Am. Int'l Specialty*, 240 F.R.D. at 407; *Coffin v. Bowater Inc.*, No. 13-227-P-C, 2005 WL 5885367, at *2 (D. Maine May 13, 2005).

"In determining whether the 'practical consequences' of a given transaction result in the 'transfer of control,' courts consider such factors as the extent of the assets acquired, including whether stock was sold, whether the purchasing entity continues to sell the same product or service, [and] whether the old customers and employees are retained . . . ." *John Crane Prod.*,

6

2012 WL 1694084, at *1 (citing *Soverain Software*, 340 F. Supp. 2d at 763-64; *M-I, LLC v. Stelly*, No. 4:09-cv-1552, 2010 WL 2196281, at *4-5 (S.D. Tex. May 26, 2010)).

Applying this legal standard, the Court is not persuaded that Wells Fargo's transfer of the Fort Wayne Business (together with its forty-one other locations) to USI amounted to a mere transfer of assets. As a result of the transfer, USI now conducts the same type of insurance business, from the same location, led by the same leader–Niezer, employing most of the same employees, and serving the same clients.

Thus, USI not only acquired assets from Wells Fargo; it, in essence, continued to operate the Fort Wayne Business with just a different name on the door. In fact, the client letter sent by Wells Fargo and USI announcing the transaction assured clients that although they would notice new signs, no changes would be made to their insurance coverage, payment schedules, or procedures and, in most cases, clients would continue to work with the same team. (Reply Ex. 3.)

Courts when applying the "practical consequences" rule under similar circumstances have concluded that the attorney-client privilege transferred with the assets. *See, e.g.*, *UTStarcom*, 2009 WL 4908579, at *5 (concluding that attorney-client privilege transferred with plaintiff's purchase of a business unit, where plaintiff continued to offer the same products to existing customers at the same locations and employed many of the same employees); *Soverain Software*, 340 F. Supp. 2d at 763 (finding that the practical consequences of the assets transfer made Soverain a successor to the commercial embodiment of the patents at issue, and therefore, it could assert the attorney-client privilege); *Parus Holdings*, 585 F. Supp. 2d at 1001 (finding that the transaction was not a mere assignment of patent rights, but a continuation of that portion of the predecessor's business responsible for the development and marketing of a product line); *Graco*

7

*Children's Prods. Inc. v. Regalo Int'l LLC*, No. Civ. A. 97-6885, 1999 WL 553478, at *4 (E.D. Pa. 1999) (concluding that where plaintiff purchased the assets and liabilities of several product lines, and the agreement included certain operations, working capital, and brand names, the attorney-client privilege concerning the validity of the patent for one of the product lines also transferred).

B&M, however, attempts to distinguish the instant circumstances from such cases, emphasizing that Wells Fargo sold just a small portion of its assets and continues to exist as an ongoing, independent entity–even in Indiana. In support, B&M cites *Card v. CSC Credit Services, Inc.*, No. 1:13-cv-1150, 2014 WL 590368, at *1 (S.D. Ind. Feb. 13, 2014), in which Defendant CSC Credit sought to disqualify plaintiff's counsel, who had formerly represented Equifax, on the basis that Equifax acquired CSC's consumer-reporting assets and assumed liability for claims predating the acquisition. The *CSC* Court denied the motion to disqualify, determining that the asset transaction did not transfer control of Equifax to CSC. *Id*. at 2. As B&M sees it, here too control of the corporation–and the attorney-client privilege–remains with Wells Fargo, and thus, Rule 1.9 concerning former clients does not apply to USI. (Def.'s Resp. 11.)

Contrary to B&M's assertion, the present circumstances are distinguishable from *Card*, as the record here reveals more "practical consequences" of the transaction. *See Soverain Software*, 340 F. Supp. 2d at 763 ("[W]hether the attorney-client relationship transfers . . . to the new owners turns on the practical consequences rather than the formalities of the particular transaction."). To reiterate, Niezer, who served as the OAM's President and company representative when B&M wrote Ryan's Employment Agreement, continues to lead the Fort

8

Wayne Business for USI. The same type of insurance business is conducted from the same geographic location, servings the same clients, and employing most of the same employees. In short, the practical consequences of the transaction is that the Fort Wayne Business has simply continued under new management. As stated earlier, courts have held under similar circumstances that the attorney-client privilege passed even though only a portion of the company's assets were transferred. *See, e.g., UTStarcom, Inc.*, 2009 WL 4908579, at *5; *Parus Holdings*, 585 F. Supp. 2d at 1001-003; *Soverain Software*, 340 F. Supp. 2d at 763; *Graco Children's Prods.*, 1999 WL 553478, at *4.

For these reasons, the Court concludes that USI is Wells Fargo's successor to the Fort Wayne Business for purposes of the attorney-client privilege. Accordingly, USI should be considered a former client of B&M under Rule 1.9.

2. <u>A "substantial relationship" exists between this matter and B&M's prior representation</u>.

Having found that USI should be considered a former client under Rule 1.9, the Court must next determine whether B&M's drafting of the Employment Agreement for OAM and its representation of Wells Fargo in the *Relue* case are substantially related to the instant matter. The Court easily concludes that the matters are substantially related.

    *a. Ryan's Employment Agreement*

B&M does not dispute that it wrote Ryan's Employment Agreement for OAM at Niezer's direction in 1994.[2] (Def.'s Resp. 4-5.) It contends, however, that the anticipated issues in this litigation are whether the Agreement was assignable to USI, *not* OAM's rights with respect to

---

[2] Rule 1.10(a) imputes all conflicts of interest to all lawyers in the firm while they are associated with the firm.

Ryan. B&M further asserts that "[w]hatever information that [B&M] supposedly received in conjunction with drafting the Agreement on behalf of OAM is irrelevant to whether the Agreement may be enforced by USI against Ryan twenty years and several corporate entities later." (Def.'s Resp. 5.)

First, the Court is not convinced by B&M's attempt to narrowly interpret USI's claims against Ryan and B&M's anticipated defense of such claims. It is early in this litigation, and Ryan reserved the right in his amended answer to name additional affirmative defenses. (Docket # 41 at 34.)

Second, it is eminently reasonable to infer that Niezer provided B&M with confidential information when it prepared the Employment Agreement on AOM's behalf. "Good attorneys . . . learn as much as they can about their client's motives, concerns, and interest before drafting documents that will legally bind the client." *Exterior Sys.*, 175 F. Supp. 2d at 1116. Indeed, "attorneys are generally prohibited from attacking the work they have done for a former client." *In re S. Kitchens, Inc.*, 216 B.R. 819, 831 (Bankr. D. Minn. 1998). In fact, Comment 1 to Rule 1.9 specifically states that "a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client." *See Exterior Sys.*, 175 F. Supp. 2d at 1117 ("In simple terms, Attorney Gillard's current client is suing the successor to her former client on a contract she created on behalf of her former client. This conflict, separate from any other potential conflict, is sufficient to warrant disqualification of Gillard."); *In re S. Kitchens*, 216 B.R. at 831 (collecting cases).

Finally, the passage of time is only one factor to consider in deciding a motion to disqualify counsel. *See* Ind. R. Prof. Cond. 1.9, cmt. 3. Although twenty years have passed since

B&M drafted the Employment Agreement, it continued to represent OAM, Acordia, and Wells Fargo during the years Ryan was employed at the Fort Wayne Business, undercutting B&M's assertion that any confidential information became obsolete by the passage of time. And in this instance, the subject matters of B&M's prior representation and the current litigation–a former or present employee purportedly engaging in competitive activities–are "not only similar, they are in important respects identical." *Healthnet, Inc. v. Health Net, Inc.*, 289 F. Supp. 2d 755, 760 (S.D. W. Va. 2003) (finding that seventeen years did not negate relevance of current case and prior representation); *see Childress v. Trans Union, LLC*, No. 1:12-cv-184, 2013 WL 1828050, at *5 (S.D. Ind. Apr. 30, 2013) (finding seven years insufficient passage of time to overcome other factors in favor of finding a substantial relationship exists).

Accordingly, B&M's former representation of OAM in writing Ryan's Employment Agreement is substantially related to the present litigation challenging that very Agreement.

    *b. The* Relue *litigation*

In addition, USI asserts that the 2009 *Relue* case–in which B&M represented Wells Fargo (or a related entity) against DeHayes and a departing employee– is substantially related to the current litigation. But B&M argues that the "differences between the present case and the [p]rior [l]awsuit are legion." (Def.'s Resp. 5.) It contends that *Relue* involved a different employment agreement; a current, rather than former, employee; and a breach of duty of loyalty claim not at issue here. (Def.'s Resp. 5-6.) It also emphasizes that the trade secrets claim was voluntarily dismissed early in the *Relue* litigation. (Def.'s Resp. 5-6.)

Where an attorney has repeatedly represented a former client, courts look to the similarity between the past and present claims to determine whether the substantive subject matters of both

11

representations overlap and whether the attorney would have been privy to a "substantial amount of discussion and strategic thinking" in its prior representation.[3] *See LaSalle Nat'l Bank*, 703 F.2d at 256 (finding that even though the attorney had not been involved in the sewage agreement underlying the current litigation, the scope of prior legal representation extended to similar sewage agreements because attorney "was clearly privy to a substantial amount of discussion and strategic thinking about the various sewage agreements"); *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir. 1978) (finding scope of prior legal representation encompassed current litigation on uranium supply contracts because attorney had previously handled numerous mining patents and real estate transactions regarding movant's uranium properties); *Safe-T-Prods., Inc. v. Learning Res., Inc.*, No. 01 C 9498, 2002 WL 31386473, at *4 (N.D. Ill. Oct. 23, 2002) (concluding that scope of prior representation extended to prior litigation addressing claims similar to the underlying litigation because the prior case exposed attorney to former client's confidential business planning and strategy).

The B&M attorney who represents Ryan here and who represented Wells Fargo in *Relue* attests that he does not believe he received any confidential information in the *Relue* litigation that would bear upon the present matter. (Kimbrough Aff. ¶ 10.) But that assertion misapprehends the inquiry at this stage; the proper inquiry is whether "it is reasonable to infer that confidential information allegedly given would have been given to a lawyer representing a

---

[3] Put another way, where an attorney has repeatedly represented a former client, courts have not engaged in a "one-to-one approach" comparing the facts underlying the current representation with the facts underlying every previous case. *Childress,* 2013 WL 1828050, at *4-5 (recognizing that the "factually distinct" language of Rule 1.9 Comment 2 allows an attorney to represent a client against a former client in other types of lawsuits, but not where the claims are being brought under the same statutory provisions he used to advocate for the former client); *cf. Misiak v. Morris Material Handling, Inc.*, No. 07 CV 6330, 2008 WL 4874178, at *2 (N.D. Ill. July 10, 2008) (finding scope of prior legal representation was limited to claims for workers' compensation and did not extend to all previous legal representation).

client in those matters." *LaSalle Nat'l Bank*, 703 F.2d at 255-56. "[I]t is not appropriate for the court to inquire into whether actual confidences were disclosed." *Westinghouse Elec. Corp.*, 588 F.2d at 224.

Contrary to B&M's characterization, the substantive subject matters of B&M's past and prior representations overlap, and it can be reasonably inferred that B&M was exposed to a "substantial amount of discussion and strategic thinking"–presumably from Niezer, at least in part–on matters involving an employee's competitive activities. *LaSalle Nat'l Bank*, 703 F.2d at 256; *see Ramos*, 2005 WL 2240036, at *2-3. This confidential information that B&M was privy to is relevant to the issues raised in this litigation, which again will presumably encompass Niezer's strategic thinking about the Fort Wayne Business and an employee's (albeit, former employee) competitive activities. *See LaSalle Nat'l Bank*, 703 F.2d at 256; *see, e.g.*, *Emmis Operating Co. v. CBS Radio, Inc.*, 480 F. Supp. 2d 1111, 1119 (S.D. Ind. 2007) (finding substantial relationship test satisfied in intentional interference with employment contract case where employee of defendant would potentially be cross-examined by counsel from the same firm that negotiated his employment contract with plaintiff); *Safe-T-Prods.*, 2002 WL 31386473, at *5 (finding relevancy prong satisfied where the court "presume[d] that [the attorney] has extensive knowledge about the business planning and strategy of the [d]efendants" and "was presumably privy to a substantial amount of strategic thinking and discussion").

On this basis, a substantial relationship exists between B&M's former representation of Wells Fargo in the *Relue* litigation and B&M's current representation of Ryan. Accordingly, USI's motion to disqualify B&M as Ryan's counsel in the present litigation under Rule 1.9(a) will be granted.

### D. Conclusion

For the foregoing reasons, the Plaintiff's Verified Motion to Disqualify Counsel for Defendant John E. Ryan (Docket # 25) is GRANTED. Defendant John Ryan's Motion to Stay the Proceedings Pending the Court's Ruling on Plaintiff's Motion to Disqualify Counsel (Docket # 31) is DENIED AS MOOT.

The Court on its own motion sets a telephonic preliminary pretrial conference for July 23, 2014, at 10:00 a.m. Accordingly, Defendant WDCK, LLC's Motion for Rule 16 Conference (Docket # 45) is deemed MOOT. Plaintiff USI's Motion for Extension of Deposition Deadline (Docket # 40) will be addressed at the preliminary pretrial conference. Counsel are to conduct a Rule 26(f) conference as soon as practicable and should be prepared to report orally, Fed. R. Civ. P. 26(f)(4), at the July 23, 2014, conference concerning a discovery plan at least through the preliminary injunction proceedings.

SO ORDERED.

Dated this 7th day of July, 2014.

S/ Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge